Good morning, Your Honors, and may it please the Court. George Kimbrell, on behalf of the appellants. With me at council table is my colleague, Amy Vonsant, and we have several of our clients here in the courtroom with us today. I'd like to reserve five minutes for rebuttal, and I'll watch my clock. All right. Thank you so much. This case is about food labeling standards and the consumer's right to know, but at its core it's an administrative law case about whether an agency rulemaking complied with Congress's directive and the basic core standards of the Administrative Procedure Act. The district court correctly held that the agency erred in one way but let the agency off the hook in two other important ways. There are three issues presented on appeal. First, the agency's treatment of highly refined bioengineered foods was arbitrary and capricious, contrary to both the Disclosure Act as well as the APA. Second, the agency's rationale for barring the similar common terms genetically engineered and genetically modified was unsupported by the record. And third, the district court erred in its remedy decision in failing to vacate the parts of the Disclosure Act rules that it held unlawful and remanded. I'd like to start first with the highly refined foods issue. Let's start with the text of the Disclosure Act itself and the definition of what bioengineered food is. Our argument here is very much based on the plain text. The definition at 7 U.S.C. 1639, subsection 1, is a bioengineered food is any food that, quote, contains genetic material that has been modified. Now, what the rules do is they tether whether a food is bioengineered to whether that modified DNA is detectable or not. Detectability is not the same thing as contains. Contains, not defined in the statute. We give it its common meaning. It means to have within. You know, from a common sense point of view, it seems odd to say that something's there when it's not detectable. Judge Collins, I think these detectability tests basically can never show absence, which is what the rules demand and what the plain text demands. They just show presence to a level of detection. And here, of course, another big issue we'll talk about, the agency didn't really set a level of detection. But why isn't that a reasonable reading? If the statute says if it contains something, and then through, you know, the best available tests, you can't detect it, you can't tell that it's there, in what sense does it contain it in a common sense, normal understanding of the word contain? If I can't tell it's there, how is it there? Two answers, Judge Collins. Number one, the tests can detect the material in highly refined foods. And we have several sites in the record that show that now current tests, not just future tests, can. There's varying sensitivity, everything from, you know, 1% to 0.05%, 20 times more sensitive. And second, again, that's just not what the scientific inquiry of these detectability tests is. We have a great quote in the further excerpts of record that I think is the best statement of this by a prominent committee of scientists. It's at FER 108. And they say, scientists know that it is not possible to declare a sample to be free of the analyte, here bioengineered content. All one can do is declare the bioengineered content to be below a limit of detection. So that's not the same as absence, just because you can't see it. But even if, okay, so even if it is a level of detection, and that is a departure from the contain that's in the definition, then why isn't that covered by their authority to determine the amount of a bioengineered substance that may be present in food in order for the food to be a bioengineered food? So Congress seemed to give them the authority to say, here's a level, below that level, we don't care. And it doesn't, why does it have to be a number? Can't they just say detectability below that, we don't care, and that fits within that? Tell me why that's wrong. I'm glad you asked, Judge Collins, four reasons to that. So the first and most important legal one, I think, is that it's a post hoc rationale. In other words, if you look at the rulemaking, the agency nowhere relies on the provision that Your Honor mentions to enact the regulation that we're discussing, which is 7 CFR 66.9. But more importantly, that provision goes to something else entirely. Does that mean we're not allowed to look at it as a question of law? I think the agency can't rely on it based on, you know, basic APA standards. As I said, under State Farm, you know, v. Motor Vehicles, it's a post hoc rationale. It's not in the rulemaking. This Court has to affirm based on what the agency says. But it's not a very long statute. Oh, that's right. And that provision, just reading the statute, leaps out. Right, absolutely. As pertinent to this issue. And it's kind of hard to ignore it. If I could give you a few more reasons in our view. I think the most important one is that that's about accidental contamination and incidental contact. So a lot of times in the food chain, you'll have cross-contamination. How do we know that? Well, that's how they applied it in the rules. There's a different rules section where they did that. But how do we know that from the text of it, that it's a bad accident? I think it's the only way to marry the contains language and the intent of Congress there with so you've got intentional use, right, and you have source traceability for that. This is how the private industry has done absence labeling, like non-GMO labeling for decades now, as well as what they do internationally. And then you have accidental or incidental contamination that can't be avoided. And that setting of a threshold is for that second category. But more importantly, two more points, if I might, is that even in 66.9 on detectability, they actually didn't set an amount, Judge Collins. I think if they had actually said here's an amount, that would be a very different rule, right? And we'd have this discussion, and I'd say they could apply it or they can't. But they didn't set an amount. They said to the manufacturers, use the test that you think is sufficient. That's not an amount. And finally, and this is, I think, also critical, in the record, they actually expressly refused to apply that statutory provision to intentional use. And I have a cite for you that it's in our reply brief, but it's 83 Federal Register 658824. And so there they were 83 Federal Register 65824. And there the agency said, Allowing entities to avoid disclosure despite the intentional presence of B.E. substances in food does not provide consumers the information they desire. And so they're saying there, no intention to set, we're not setting the amount, we're not using that set amount provision for intentional use. It's only for accidental. So I think those are the key answers there that that, why that doesn't apply here. But going back to the statutory scheme, in addition to the definition, another really important part is the fact that this scheme is supposed to provide consumers information not just about bioengineered food, but any food that may be bioengineered. Now, how can you square detectability with a scheme that's supposed to cover may be bioengineered as well? It's much broader than detectability. So we have other evidence in the scheme. Again, there's no express exclusion or language. Nowhere does Congress say detectability. Instead, it says contains, and it says may be bioengineered. And it did know how to write exclusions. As you know, to Judge Collins, it's a short statute and there are some exclusions in it for restaurant food, for example, from feed from animals that are fed genetically engineered grains. So if it wanted to make this about detectability, it could have. And the reason it didn't is because the consumer interest here in this law has nothing to do with whether or not you can see the modified DNA in these products. Consumers are interested about this because they want to know more about how the crop is produced. That's the information they want. And that has nothing to do with whether you can see it in the final product or not. The last point I would make on the definition is that the definition itself uses past tense language. It says genetic material that has been modified, which, again, indicates this is not just about the final product. Undisputably, the raw ingredients have been modified when they go into the product. The legislative history also supports us on this. USDA went, testified to Congress. The attorney general of the agency, the defendant agency, said to Congress, we're going to cover these foods. We have the authority. Now in the final rule, they're saying the exact opposite. We don't have the authority. We're going to define them out of bioengineered foods. And finally, I would say it's not just my clients that believe that this is the intent of the law and critical to it. If you look at volume two of the ERs here, it is a venerable who's who of the best, the biggest food corporations in America that all supported the inclusion of refined bioengineered foods in this standard. Coca-Cola, presumably major food and beverage manufacturer, that's at ER 245. They say it's critical and essential that refined bioengineered foods be included in the standard. Mars, Hershey's, Campbell's Soup, Kraft, Heinz, the Grocery Manufacturers Association, the Frozen Food Institute, the Snack Food Institute, and it goes on. And why did they say that? For the same reason I just gave. In their comments, when you read them, they say consumers want this information because they want information about how the food is produced, and they don't care whether or not you can see it in the DNA or not in the final product based on the refining. There is a way to do this, and I would say looking at 66.9, section one, the source tracing is the way to do this, as I mentioned before. That's records of what your ingredients are. So even if these two detectability sections are not proper under the statute, there is a way to do this. I will say our fallback argument on claim one has to do with even if this is allowable, detectability is allowable under the statute, it's still arbitrary and capricious the way they did it here for the reason I mentioned earlier. Because of the records? Because it's up to each company to keep the records of this? Absolutely, Judge. mechanism that determines whether or not it contains bioengineered food? Absolutely, Judge Wardlaw. Even if detectability is allowable under the Disclosure Act, the way they did it, you can have the same product, two different companies, they used two different tests, two different levels of detection, because the agency didn't set a level of detection or a threshold here for detectability, and you're going to have two different results. Same product, two different results. Or think about two different sodas with the same genetically engineered corn syrup in it. One company uses a sensitive test, one company uses a not sensitive test, one company labels, the other doesn't. It's an uneven playing field, and it's not the uniform standard for consumers that Congress envisioned. And finally, I would say the other reason it's arbitrary and capricious is what I said before Judge Collins, is that the record evidence now shows you can see the DNA in these highly refined foods. And we have a number of sites for that in our reply brief, the best one being SER-235 and ER-803. Now I want to move to the second argument with regards to similar terms. The key here is that Congress didn't legislate in a vacuum. If we were starting from scratch here, that would be one thing, if there were no known terms for this subject. But we're not, and Congress doesn't legislate in a vacuum. For two and a half years, we've had well-known terms that have permeated American culture, genetically engineered and genetically modified. And so the question before the court is simply whether the agency's given rationale in the record were supported by the record evidence. The two rationale that they gave for barring those terms and going only with bioengineered were it would be, it would lessen consumer confusion. Did they bar the term? I mean, they require that, you know, these terms be used, but did they bar somebody from putting something else on the product? Judge Collins, for the standard, the only way you can comply with the on text or the symbol is bioengineered. So yes, like if you want to use a symbol, and they did propose early in the rulemaking a symbol that would be GMO in a circle. We have that in the excerpts of record as well. So this is a new position for them. But yeah, the only way you can comply on text, it says made with bioengineered ingredients or the circle with the BE in it. You can't use the other terms. Right. You have those, but can you put elsewhere on the product, something else if you want? Voluntarily?  I think so, sure. But that's the thing. So it's not barred, and that's not like it's you may not use that term. I agree. It cannot show up. I agree. It's not your – it's barred in the sense that it's not adequate to comply. Fulfill the standard, absolutely. I will say, though, we had voluntary GMO labeling for several decades, and nobody labeled. And manufacturers are very – that pack of space is precious. So I think it is unrealistic that there will be, and frankly, more confusing for consumers that they could put extra verbiage on there rather than just have one term. So why did – the problem is Congress used the term bioengineered. I mean, they do have references to other terms in the statute, but the primary term used is bioengineered. Why did they – if they legislate against a background where everyone was using different language, why did they do it this way? Yeah. I mean, they included the term, and it's undisputable that's one of the options. There's no legislative history to answer your question. But it's kind of hard to fault them from just using the language Congress used. If you look at the legislative history, overwhelmingly, the legislators themselves – this is at page 51 of our opening brief – used genetically engineered and genetically modified. So, yes, they put bioengineered in the statute. They also put similar terms in the statute. And this is important. They grouped them several times in the statute using – and called them similar terms. The most prominent one, the easiest one, is 7 U.S.C. 6524, where they say non-bioengineered, non-GMO, and, quote, any other similar term, which strongly indicates Congress believed them to be similar terms. But I just want to say, with regards to the agency rationales that they gave, our fundamental claim is they're just unsupported by the record. Overwhelmingly, the record evidence shows that consumers don't understand bioengineered, and they know genetically engineered and genetically modified, contrary to the agency's decision. Under APA standards, the USDA has to address that data on use and that consumer confusion presented, and it has to offer an explanation of how the restriction complies with similar terms. If USDA had said in the rule, okay, they're not similar terms because we think bioengineered means this, and genetically engineered means this, that would be a very different rule. But they didn't do that. They were expressly asked to do that, in fact, and we have those sites in our reply brief. And they said, no, we're not distinguishing them now. So a claim to try to distinguish them now is, again, post hoc and can't be made. I want to reserve five minutes, but on the remedy question, I think the core of it is, all we're asking this Court to do is send it back and ask the district court to look at disruptive consequences with a careful, evidence-based eye, the way it should have here. It can't be enough for USDA to say, well, we think there's going to be disruption. Imagine if I came before you and I said for an injunction, I think there's going to be irreparable harm. You need to have evidence when it's your burden in these instances. And if you look at ER-21, the district court simply just deferred to their statement. And we could have tailored evocator remedy if they needed to get through this inventory in a way that would have addressed that question. I'll reserve the rest of my time. Thank you, counsel. Good morning, Your Honors. Adam Jett on behalf of the United States. May it please the Court. I'd like to start, if I may, with the colloquy that my friend had with Judge Collins about essentially this positive distinction between detectability and the actual presence of modified genetic material. Now, plaintiff's view is even when testing establishes that the food is not bioengineered. Now, Congress easily could have written that statute. We know these were the very issues that were subject to debate before Congress. And interestingly, I think my friend maybe tipped his hand up at the podium when he said, look, he said, there's a better way to go about this. You use source tracing. Now, if you look to the preamble of the final rule, you can find this at 2 S.E.R. 37. The very same sort of genetic testing that my friend does not want to use to figure out whether something is present in an actual food is used for source tracing. In other words, you can have, one might call it contamination. You can have sort of mix-ups between genetically modified food and not genetically modified food during transport, during storage. And actually, as a case that my friend cites in his reply brief, Monsanto v. Gerson points out, you can even potentially have cross-contamination in a field where you just have kind of pollination from a genetically modified plant to a non-genetically modified plant. What the administrative record points out is actually it's the very same sort of genetic testing that I think my friend is opposed to is what accomplishes the very source tracing that he's willing to embrace. And so, Judge Collins, I think — JUSTICE SCALIA. It was the answer that this is inevitable. You have to use some sort of detectability at some point in the chain? MR. CLEMENT. Well, it seems like all agree that some kind of detectability is going to be used. I mean, unless you somehow managed to, like, grow and perfectly quarantine certain kinds of foods, which is just not how the — JUSTICE SCALIA. What I take their argument is that if you know that the input is genetically modified, and then it's refined into a final product, and then on the final product it becomes undetectable, it still contains, because you know you put it in. MR. CLEMENT. You're right. I think that is their argument. And I think the point is just because at some point you used a kind of origin source that was genetically modified, it doesn't mean that what you've ultimately produced actually, again, to sort of echo the statutory definition, actually contains the modified genetic material. Now, to be — JUSTICE SOTOMAYOR. If you put it in, why doesn't it contain it? See, it seems to me, I don't know if the agency actually did what Congress told it to do, because Congress wanted to have a national standard for disclosure of food that contains bioengineered material. And I'm not sure that that's what the agency actually did, because it left it in the hands of all the companies to, you know, decide is this detectable or not in the final product, and put in anything they want. MR. CLEMENT. Well, Judge Wardlaw, maybe if I could take those two points. JUSTICE SOTOMAYOR. To the food. I mean, you know, it's a — there's a reason Congress did this act. And, you know, the question I have is did the agency actually do what Congress told it to do? MR. CLEMENT. So I think there are maybe two points nested in there, so if I could take those in order. So first, what does the statute actually say and require? I think maybe some of the premise of Your Honor's question very much sounds like what was one side of the debate before Congress, and is just kind of ultimately the debate that lost out. You know, for those members of the panel who are interested in the legislative history, obviously there were members of Congress who thought that it should kind of more categorically require labeling of any food that was made originally from a genetically modified plant. And instead, the statute that Congress ended up passing is one that looks at the sort of final food, the food being labeled, and whether that contains the modified genetic material. And I wonder if maybe some of this confusion is kind of tied up — I guess this is both an answer to Judge Wardlaw and Judge Collins — is a little bit tied up in this idea that if somehow there was some genetically modified material that went in in the beginning, as I think one of the questions phrased it, that somehow it must still be there. So maybe here's a kind of way to think about this. In the — and I should, by the way, just sort of say up front, because this has gotten a little bit confused in the briefs — the final rule does not actually itself exempt highly refined foods. There was a request that USDA do so. That's not what USDA did. Instead, the final rule just says, look, you can use testing to determine whether genetically modified material is present. But intuitively, the agency said, there may be instances where it is not present. And the way that I've kind of wrapped my head around this question of basically, like, where does the DNA go is there are kind of two buckets of ways that you could start with a genetically modified plant — a soybean growing in a field or a sugar beet growing in a field or something like that — and you could end up producing a final food item that does not contain DNA from the original plant. One kind of category of that is — I think it's called isolation. It's basically physical removal. So if you've got a plant that's out there in the field, it's almost a chemical factory. It's going through photosynthesis. It's constantly giving off, for example, carbon dioxide — or, excuse me, oxygen, just spewing oxygen into the air. And it's also manufacturing sugar. There's sort of sugar that's slowly accumulating in the plant as a product of that photosynthesis process. And there are kind of steps that can be taken basically to isolate the plant stuff, like the cells, the actual plant matter, from this chemical — the sugar, if you're talking about a sugar beet, or a fat, if you're talking about soybean oil — that was being manufactured by the plant. And then kind of separate and aside from the physical isolation, there's also the term — if you're on our looks in the record — is it degrades DNA. Essentially, when you process foods at a high enough temperature and with extreme enough pH, it basically obliterates the DNA. It's like water could be separated into hydrogen and oxygen. And once you've done that, you've got hydrogen, you've got oxygen, you just don't have water left anymore. And so there are a number of studies that have said that these kind of extreme processing steps basically kind of, in some combination — and it depends on the process — kind of physically get rid of the plant matter and just obliterate the DNA that's there. You addressed the point that the agency is allowing different companies to use different detectability methods on the same product, resulting in exactly the same underlying physical thing being labeled or not labeled based on which test which company uses? Yeah, so I guess there's kind of a theoretical answer to that concern and a practical answer to that concern. I mean, it is always theoretically possible that if you used two different tests and somehow one test was a little more sensitive than another, and somehow a food happened to fall kind of right in between, that you could end up with essentially that kind of philosopher's example that my friends offer. And to be very clear, this is spelled out in the regs, if someone knowingly did so, in other words, if a company kind of knew that there was modified genetic material in there and kind of tried to duck it, then they would still need to label it. But the practical answer, Your Honor, is threefold. One, I think just if you look at the standards that are actually set out in the rule for what kind of test you need to use, contrary to my friend's assertion, the standards aren't just kind of pick whatever test you want, watch on YouTube, had a test for DNA and use that. Instead, there are various criteria that are set up for the test. And I take my friends to complain, and particularly in some detail for the first time in the reply brief, that basically that the agency didn't set a specific like parts per million threshold. And this is just kind of the classic like rule standards debate in law. The agency laid out a bunch of standards. It needs to be lab quality. It needs to be fit for purpose. It needs to be consistent. It needs to be accurate. And as I understand it, the reason that the agency essentially chose the standard side of the rule standards debate is there are different sorts of criteria that you may need to use for different sorts of food. In other words, to have sort of some confidence that there is not any modified genetic material in some kinds of food, you might need something that's like a little more sensitive than others. And what the agency also said, you can find that at 2 S.E.R. 20 to 21 and 2 S.E.R. 47, that the agency would put out further guidance. And to the extent that the plaintiff's complaint just may reduce to the idea that either they think that the agency's guidance needs to be more detailed or somehow they're unhappy with how this is playing out in the real world, if maybe they think the agency is not enforcing the rules in the way that they think the agency should be enforcing the rules, none of that would go to the validity of the rule itself. That would just be a separate quarrel with what the agency has subsequently done. And again, just to take this back to an earlier answer that I gave, Your Honors, the plaintiffs seem to be willing to accept all of this because they seem to be willing to accept that they're going to rely on supply chain tracking, which itself makes use of some of this. But if we actually did have a situation where it became known, and it's not just a philosopher's example, that Company A on basically the same underlying product is using one test and labeling it, and Company B is using another test and is not labeling it, would the agency do anything with that situation or would that just be allowed to go forward under this regulation? Look, you know, I obviously sort of can't get ahead on the agency of sort of how they would address this. I suspect that this is just my speculation. The point is that if there do — if the regulations allow them to do what Judge Collins is saying, then the agency has not established a mandatory national standard. So I think that's mistaken, and I think maybe I'm starting to understand that this may all be sort of proceeding from a somewhat mistaken premise about the statute. So maybe if I could just explain that for a moment. And, Judge Wardlaw, I think this will maybe both answer your question and will also be responsive to the colloquy that Judge Collins had with my friend about the provision that says the agency can set kind of thresholds. So if Your Honors just look at the statutory command to the agency — Judge Wardlaw, I think this is the one that you're referring to — it says that the agency should establish a standard for foods with respect to foods that are bioengineered or may be bioengineered. Now, I think my friends first are reading a standard with respect to foods that are bioengineered or may be bioengineered to mean must label any food that is bioengineered or may be bioengineered, rather than this is essentially the kind of field that the agency is meant to establish a standard for. And then there are further —  But that would seem to suggest that we've decided not to have it. That's a standard with respect to. I mean, it's got to be more than that. Well, Judge Collins, if they just threw up their hands and said we're not — we've just chosen to have no rule, that may very well be arbitrary and capricious. And I'm very happy to — But if they just deferred to corporate America and said, okay, you can just regulate yourselves, then they haven't — then the agency has not established a national standard itself. Well, again, Judge — Judge Wardlaw, I think your question is almost a kind of perfect recitation of the arbitrary and capricious standard. If an agency just threw up its hands and said we've just chosen not to regulate this area, do whatever you want to do, it seems like there would be an extremely strong argument that that was arbitrary and capricious. If instead the agency does what it did here and said, look, there's a lot of accumulated science about this, there are international standards, we're already using genetic testing to track supply chains and to make a point that the district court honed in on, we don't want to demand the impossible. And, of course, to demand what the plaintiffs are asking for, it would essentially require implementing the statute in a way that Congress explicitly chose not to require not to write the statute. And, in fact, actually, it would read the statute to me in the very opposite of what my friends —  Mr. Jett, I have to let you know we're under time constraints today. Oh, of course. I apologize, Your Honor. So we're not going to give extra time to your colleague. Of course. I apologize, Your Honor. If I could just — Okay. But remember, we have time constraints. Yes. I know. But just one quick question. Can you respond to the objection that you — the agency waived the reliance on that threshold provision because it wasn't cited in the regulation? Yes, Judge Collins. I appreciate the opportunity to do that. We are not saying — We're not giving extra time to your colleague. Go ahead. We are using that as a statute as the — we're using it for a statute as a whole argument. What we're saying is that my friend should not read with respect to as requiring labeling of absolutely everything and should not read maybe bioengineered to be if there is any theoretical possibility that it's bioengineered. That would be an anomalous reading of the statute in a vacuum, but it's particularly anomalous to read those provisions in such a highly demanding way where the statute elsewhere, including in the provision, Judge Collins, that you were just asking about, freely allows for having some modified genetic material in food. Thank you, Your Honors. Thank you, Mr. Jedd. Okay. Ms. McCabe. Good morning, Your Honors. May it please the Court, Bridget McCabe, on behalf of the intervener appellees, the two beet sugar organizations. Let me just start by adding that the statute contains an enforcement provision through which the agency can enforce these. What provision is that? It's 7 U.S.C. section 1639, subsection G. G. Okay. I'm not sure. And it's through this provision that the agency can regulate the way that the companies are using the test to exempt themselves from the main material. 1639 with a letter after it or not? Yes. Subsection G. Well — I'm sorry. Is it 1639? Oh, I'm sorry. Yes. 1639B. B? B. Okay. As in boy, subsection G. All right. Thank you, Your Honor. It contains a definition of a prohibited act, recordkeeping, examination, audit, and audit results. I know my time is brief, so I'm just going to forge ahead, but please let me know if there's any questions. We wanted to appear today to highlight just a couple of brief points. And one is that the beet sugar product is a great example of how the final rule is rationally related to the science. And that is because the process by which we take a sugar beet crop and come up with sugar is such a harsh process, it removes all traces of genetic material. It converts the crop to refined white sugar, and at the end, the product contains no trace of genetic material. And so the agency had a record that was replete with science indicating this. They came up with a rule that's rationally related to that science, to the studies in the record, and they issued a final rule that accounts for this, that there are products that might begin with a crop, but you end up with a product that doesn't contain any genetic material. This isn't a derived-from standard. It's a contained standard. And the appellants were involved in the legislative process. They pushed for a derived-from standard. That was considered and rejected. And the last point we wanted to raise is that AMS properly balanced the fact that this is a marketing standard, and they had to balance the impact to regulated entities with the consumer's demand for disclosure. The legislative history instructed the agency to minimize disruptions to the supply chain. And here, when you have a resulting product, refined white sugar, that is identical on a molecular level, if one were forced to be labeled with a BE label and the other weren't, you would create a really stark price differential for two identical products. And this price differential would disrupt the supply chain in really pretty enormous respects. So AMS did exactly what the law required. They examined relevant data, and they made a rational connection between the facts and the rule. And for that reason, the district court's opinion should be considered. So you said you point to it shall be a prohibited act, but what are the consequences for someone who engages in a prohibited act? Well, that's up to the agency. Well, so that part is not in the statute. And as my colleague said, it's a matter of enforcement. There is a guidance document that was issued by the USDA on testing methods. It's on their website. It gives guidance to the entities who are using these tests. But if there's no consequences for a prohibited act, then how? There very well may be. It's just not in the statute that I can see. There's a prohibited act, a recordkeeping requirement. There's an examination and an audit. There will be a notice and a hearing, and the audit results will be published. Is there anything in the statute that preempts state laws from enforcing these provisions? I'm not aware of that, Your Honor. Not that I'm aware of. All right. Thank you, counsel. Thank you. Mr. Kimbrough. Thank you, Your Honor. Just a few points. Starting where my colleague left off for the interveners, with regards to the costs overall for the rule, USDA did look at this. And very clearly, the rule itself is more costly than if they had included refined foods in the standard and required disclosure. So the sites for that are ER-284 and 286. And that's the regulatory impact analysis of USDA itself saying this is going to be more expensive, actually, to manufacturers to do all this testing and make this exclusion rather than if we had just included it. Do you want to address the QR code disclosure? Yes, Judge Wardlaw. With regards to Vocoder or just generally? Vocoder. Yes. As I mentioned a little bit at the end of basically, you know, the district court was correct in finding that the QR codes were unlawful in terms of them going out on products without any other labeling and remanded that to the district court or to the agency but didn't vacate it. And in our view, it should have vacated it. Right now, it's been two years since that decision. There's nothing that's happened on remand from the agency, no timeline for them to act. And in the interim, these QR code packages are out there. And it's very clear USDA's own assessment said consumers can't access them. And Congress was concerned about that risk and put a provision in the statute to address it. And it said you needed to have additional and comparable options to access the QR code, the smartphone labeling. I mean, the idea that we're going to walk around the grocery store scanning everything with our phones practicably seems illusory to me. But anyway, they haven't done it, and it wasn't vacated, so they're out there. So we're asking that the district court should have vacated that provision. This is the text messaging provision? It's related to that, Judge Gilman. Yeah, it should have vacated both of them because the text message was their purported solution to the problem that the district court correctly held it didn't solve. Just because you could still have the QR codes there out alone. It just gave manufacturers a fourth option to use instead of fixing the QR code packaging. If I could just make a few rebuttal points to my colleagues on the other side. Source tracing is not based on detectability. Source tracing is just looking at the raw ingredients. It's very simple. Is it true, as your friend on the other side said, that the source tracing doesn't necessarily show that the ultimate food that the consumer is buying is bioengineered? It does. And then you have the accidental contamination provision we talked about before. So absent that and the threshold that was set there, unlike for detectability, where they did actually set a threshold, it would prove that. And that's what you have for absence labeling, like ARAMIKI, the non-GMO project, source tracing. There are 10,000 foods that are left out of this standard because highly refined foods are excluded. I wanted to note that. And my colleague mentioned there was a debate in Congress. I just want to highlight FER 146. That's USDA's general counsel telling Congress that refined, bioengineered foods would be covered. He said the DNA goes somewhere. It doesn't go anywhere. It's in there. We can either see it or we can't. The way that without my readers I can't maybe see my words on my page, but with them I can see them. If you fragment and degrade the material, that's at FER 175, that's what happens in milling and refining and heating. But it doesn't go anywhere. It gets smaller and smaller bits and you need a more refined test to see it. That's it. In terms of limits on the manufacturer's discretion to use any test, this is the type of language USDA used. Pick something sufficient. Pick something fit. Pick something appropriate. They're very vague terms that beg questions like sufficient for what, fit for what, appropriate for what, and leave it all to the manufacturers to decide. And there is no expressly, there is no burden on them to use a more sensitive test. In fact, it's the opposite. If you look at 7 CFR 66.9 B2, once a refined process has been validated, there's quote, no additional testing necessary. So that means once they have an insensitive test that they want to use for one product, they can keep running products through that as long as they want until they're done without any duty to increase it. Beet sugar. You can see the DNA in the beet sugar. That's at ER 297. That's refined beet sugar. It's not true that it doesn't exist or it's totally eliminated. I would say in closing, this case is arbitrary and capricious bingo. We got it all here. We got post hoc rationales. We have contrary to the evidence. We have extra statutory factors. We have failing to grapple with the evidence. And we have failure to further congressional intent with the statute's language and its policy. They all apply to the claims. For all these reasons, we ask this Court reverse and remand. All right. Thank you, Counsel. Natural Grocers v. Vilsack is submitted. And this session of the Court is adjourned for today.
judges: Gilman, WARDLAW, COLLINS